The following is the PDF of an official transcript.  Official transcripts may be filed in CM/ECF only by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days.  You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

1

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
                        ATLANTA DIVISION

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )   CRIMINAL ACTION FILE
            v.                     )   NO. 1:23-CR-00229-JPB-RDC-1
                                   )
CHARLES DUNN,                      )
                                   )   DETENTION HEARING
                Defendant.         )
_____    )
-----------------------------------------------------------

                   BEFORE THE HONORABLE
           MAGISTRATE JUDGE CHRISTOPHER C. BLY
                TRANSCRIPT OF PROCEEDINGS
                     JULY 17, 2023

-----------------------------------------------------------
APPEARANCES:

For the Plaintiff:          REBECA M. OJEDA
                            Office of the U.S. Attorney
                            Northern District of Georgia
                            75 Ted Turner Drive SW
                            Suite 600
                            Atlanta Georgia   30303

For the Defendant:          SARALIENE DURRETT
                            Attorney at Law
                            Saraliene Smith Durrett, LLC
                            1800 Peachtree Street NE
                            Suite 300
                            Atlanta, Georgia   30309


        Proceedings recorded by mechanical stenography
          and computer-aided transcript produced by

              WYNETTE C. BLATHERS, RMR, CRR
                 Official Court Reporter
                  2114 U.S. Courthouse
                 75 Ted Turner Drive, SW
                 Atlanta, Georgia   30303
                    (404) 215-1547
```

2

Monday Morning Session

July 17, 2023

10:05 a.m.

- - -

P R O C E E D I N G S

COURTROOM DEPUTY:  All rise.  The Honorable Judge Christopher Bly presiding.

THE COURT:  Good morning.  Please be seated.  The Court calls the case of United States of America v. Charles Dunn.  It's Criminal Action No. 23-CR-229.  Rebeca Ojeda is here on behalf of the United States.  Good morning to you.

MS. OJEDA:  Good morning.

THE COURT:  Saraliene Durrett is here on behalf of Mr. Dunn.  Good morning, Ms. Durrett.

MS. DURRETT:  Good morning, your Honor.

THE COURT:  Good morning, Mr. Dunn.

THE DEFENDANT:  Good morning.

THE COURT:  We're here for a detention hearing, and, Ms. Ojeda, I will turn it over to you.

MS. OJEDA:  Thank you, your Honor.  Your Honor, the United States has moved to detain Mr. Dunn last week, and so we are still standing by our position, your Honor, that no condition or combination of conditions can reasonably assure his appearance or the safety of the community should he be released.

Your Honor, first I would like to start with the charges that he's facing at this time and the penalties as well.  He is charged with conspiracy to possess with the intent to distribute over 5 kilograms of a mixture and substance containing cocaine, so he's looking at a maximum life sentence your Honor, minimum of ten years.  He's also --

THE COURT:  Mandatory minimum --

MS. OJEDA:  Mandatory, yes, mandatory minimum of ten years.  He's also charged with conspiracy to commit a Hobbs Act robbery, which also has a maximum sentence of 20 years.  And as stated in our motion, he is eligible and qualifies to be detained.  Not only is our rebuttable presumption based on the crimes that he's being charged with, including the controlled substance offense with a term of imprisonment of ten years or more, but we do believe he has a serious risk that he will flee and is a danger to the community.

We want to go through some of the factors that we think the Court should consider in detaining -- whether or not to detain Mr. Dunn.  First, at the outset I do think it's helpful to kind of give a little context, and I know the Court has heard from myself and my co-counsel about this case.  But specific to Mr. Dunn I want to say that the government does intend to supersede the indictment and bring more charges, not only the conspiracy to commit drug trafficking but substantive drug counts as well as money laundering counts and a

continuing criminal enterprise count specifically against Mr. Dunn. And part of that, your Honor, is because of his role in this conspiracy, in this drug trafficking and money laundering organization.

This is a case that is based on a wiretap investigation. There's a significant amount of physical and electronic surveillance and investigation into finances as well as businesses in this case. And the investigation has revealed that Mr. Dunn obtains hundreds of kilograms of cocaine from Co-defendant Mr. Macedo-Rios as well as other suppliers and then utilizes his vast distribution network to supply various conspirators in Georgia, Alabama, South Carolina, North Carolina, Florida, Tennessee, New York, and Ohio with serious quantities of cocaine.

Mr. Dunn has shown that he is a sophisticated drug trafficker. He uses multiple phones. He has entrusted couriers, several entrusted couriers, that he has used to traffic to these multiple locations. He has multiple businesses which I'll go into in a minute, your Honor, that we think for the most part are fronts which he uses to facilitate his drug trafficking.

One of the reasons that we actually started on this investigation, your Honor, it dates back to the date of the conspiracy, September 28th, 2023, and that's when one of the charged co-defendants, Mobley, was actually stopped in

Kentucky and had possession not only of 6 kilograms of cocaine but also a firearm, which she stated she got the cocaine from Atlanta and was driving to Ohio to transfer it.  And she said that she had obtained the cocaine from someone by the name of Skill.  Mr. Dunn actually goes by the name of Silk.  That is one of his nicknames that he actually uses in his book that he's published.

She actually provided authorities with a phone number for the person that she got the drugs from, Skill, which is the number that agents later identified as the number used by Charles Dunn.

THE COURT:  And she said his name was Skill?

MS. OJEDA:  She referred to him as Skill, your Honor. That's the report that we have from Kentucky.

Your Honor, that was back in September.  This investigation started going, and the wiretap investigation began.  And once we hit the wiretap, your Honor, it was nonstop, and I'm going to go through some of instances that we have Mr. Dunn not only directly involved with certain amounts of distribution of cocaine but also his efforts to obtain more and more of it and that he wasn't deterred.

Starting in February 21st, 2023 Mr. Dunn was intercepted discussing the distribution of 5 kilograms of cocaine to a customer in South Carolina.  February 25th, 2023, co-defendant, Marquis Smith, was arrested in Covington,

Georgia in possession of 4 kilograms of cocaine and a loaded handgun in his vehicle.  Now, Mr. Marquis Smith was heading to South Carolina to conduct a drug transaction that had been coordinated by the defendant, and according to his intercepts, Marquis Smith had actually just obtained the cocaine from Mr. Dunn's residence, his vehicle that was inside of his residence, before he headed off to South Carolina.  So that's on the 25th.

Now on the 26th we intercept Mr. Dunn telling his co-defendant, Mr. Macedo-Rios, who your Honor is familiar is one of Mr. Dunn's suppliers of cocaine -- we intercept a call from Mr. Dunn telling Mr. Macedo-Rios that he's not worried about these two intercepts, that he has a history of distribution of several kilograms of cocaine.

I'd like to play an audio that has been shared with the defense counsel at this time.  And, your Honor, this is an audio from the wiretap on February 26th.  This is going to be on Exhibit -- I apologize it's out of order, but it will be Exhibit 3 I'd like to submit it to the Court.  And I'll give you a copy of it as well.

(Whereupon, an audio recording was played.)

MS. OJEDA:  So, your Honor, that's an example, and I know it's difficult to hear.  But here Mr. Dunn is telling Macedo-Rios, based on these intercepts, that he has distributed 30,000 bricks, which we assume are, based on our

investigation, we believe are a kilogram of bricks.  And then he referenced he's only been caught -- he's only had the two people, one for six, which we believe is a reference to Tyshaun Mobley in September being caught with 6 kilos.  And then he said and this one for four, which would reference the day before the arrest of Marquis Smith with 4 kilos.

THE COURT:  And what did he say?  That he had distributed 30,000 --

MS. OJEDA:  30,000 bricks.

Your Honor, continuing, two days later we intercepted communications where Mr. Dunn was coordinating with Macedo-Rios to obtain 5 more kilograms for distribution that was going to be -- and that transaction was going to occur in Mr. Dunn's warehouse.  Now, this warehouse features prominently in this investigation because it's a warehouse where Mr. Dunn allegedly maintains Silk Logistics, which is a transportation company, which I'll discuss here in a minute about what kind of business that they do.

The location of this warehouse is actually a dead end, and once people go into the fenced off area and into the back, it cannot be observed from the road.  And as a result, several of the transactions that we intercepted over the wire, they always headed out to 535 Milam Road.  535 is what they refer to it as, and that's where this warehouse was, this big structure.  And they would go back, and transactions would

occur.

Your Honor, there was actually a pole camera outside of Milam Road, and so agents were able to see when vehicles were going in, so vehicles that were known to be driven by Mr. Dunn, vehicles that were known to be driven by Mr. Macedo-Rios, as well as vehicles that were known to be driven by different couriers. And that was determined -- who was driving what was based on the investigation and matching things up with what cars are registered to whom.

So February 28th, your Honor, the pole cam footage did show Mr. Macedo-Rios going to meet a courier to get -- to do this drug transaction that had been coordinated by he and Dunn.

Then we have on March 5th, your Honor, 2023, Mr. Dunn coordinated a 4-kilogram cocaine transaction where the co-defendant, Darrius Elliott, would actually retrieve 4 kilograms of cocaine from an unknown individual in Lawrenceville, Georgia, and at that time Mr. Elliott was actually arrested with those drugs.

On April 11th, 2023 another example is Mr. Dunn actually sent co-defendant, Afiba Small John (sic) to obtain 13 to 15 kilos of cocaine from a source of supply in New York -- excuse me -- in New Jersey. Mr. Small seemingly delivered some of those drugs, and then on his way back to Atlanta was stopped by law enforcement which seized

9 kilograms of cocaine and $55,545 of cash from the vehicle. And that was the indicator to us, your Honor, that some of the drugs had been already sold because of that amount of cash that was already there.

THE COURT:  You said 9 kilograms?

MS. OJEDA:  It was 9 kilograms seized.

THE COURT:  How much cash?

MS. OJEDA:  55,000.

THE COURT:  55?

MS. OJEDA:  55,545.  Four days later, your Honor, there's another meeting at that Milam Avenue warehouse where the defendant and Macedo-Rios obtained -- coordinated the obtaining of 3 additional kilograms of cocaine.

April 18th, your Honor, we obtained other intercepts and observed individuals going again back into that warehouse at Milam Avenue to provide the defendant's courier with 4 additional kilos of cocaine.  So that was on April 18th.  And, your Honor, I think what's significant here is on April 27th the law enforcement, they actually were able to find one of these suppliers.  They went to his residence, and they seized over 170 kilos of cocaine from the supplier's residence.  The supplier was arrested, and that was on April 27th.  And Mr. Dunn was informed about this arrest through Macedo-Rios, and then just days later, May 5th, without pause Mr. Dunn is captured back on the wire coordinating a 30-kilogram cocaine

deal.

If we go to June 25th, your Honor, additional intercepts showed that Mr. Dunn and his co-defendant, Mr. Macedo, coordinating a 20-kilogram deal.

THE COURT:  That was June 5th you said?

MS. OJEDA:  June 25th.

THE COURT:  25th.  You said that was 25?  20 kilograms?

MS. OJEDA:  Well, they were coordinating a 20-kilogram deal on June 25th.

THE COURT:  Got you.

MS. OJEDA:  At this point, your Honor, we actually had aerial footage where the meeting could be observed from the aerial footage.  Mr. Dunn himself did not -- he coordinated it with Mr. Macedo and sent his courier.

Mr. Macedo-Rios through the aerial footage is seen getting a bag -- it was a bag from the trunk of the supplier -- bringing it to the vehicle of Co-defendant Stephen Allen who was later arrested and stopped in possession of 22 kilos of cocaine.  Stephen Allen, again, is one of Mr. Dunn's known and often utilized couriers.

The day after, on June 26th, 2023, after all these seizures and after that significant seizure with 22 kilos, Mr. Dunn was captured back on the wire not deterred, and I'd like to play another audio recording.  And this is going to be

labeled as Government Exhibit 1.

THE COURT:  What was the exhibit number for the first one?

MS. OJEDA:  Exhibit No. 3.

THE COURT:  Ms. Durrett, any objection to the first one, to Exhibit 3?

MS. DURRETT:  Your Honor, obviously I haven't had -- I've heard them.  I don't object to them being played for the purposes of this hearing.

THE COURT:  Okay.  So 1 and 3 are both admitted.

(Whereupon, an audio recording was played.)

MS. OJEDA:  And, your Honor, here that was a conversation between Macedo-Rios and Mr. Dunn immediately -- this is the day after Mr. Allen is caught with 22-kilos and we --

THE COURT:  Mr. Dunn is the one at the end saying what I'm worried about is not getting enough work?

MS. OJEDA:  Right, right.  And they referred to big man.  Macedo and Mr. Dunn referred to the big man as the individuals they're getting cocaine from, their sources of supply.  They would alternate.  That's who they were getting their drugs from.  So that was on June 26th, your Honor.

On June 28th an investigation was done to determine that another courier actually traveled to Mr. Dunn's residence and acquired 3 kilograms of cocaine, and while that courier

was traveling to Augusta, Georgia to deliver the 3 kilograms to a customer in South Carolina, he was stopped by local law enforcement and arrested, and the seizures -- the drugs were seized.  And two days later Mr. Dunn is back on the wire intercept finding another courier, trying to convince someone else to run drugs for him.

On July 5th, 2023 -- well, immediately before July 25th Mr. Dunn is intercepted discussing obtaining a car with hidden compartments with traps so that to easily hide drugs in that vehicle and transport them.  He is also intercepted on the wire coordinating another 10 kilos, obtaining another 10 kilos of cocaine.

So on July 5th agents observed a white Chrysler Pacifica minivan arrive at that warehouse at Milam Road.  He was observed, Mr. Dunn, was observed walking over to that white minivan, and actually soon thereafter, Mr. Macedo-Rios arrived at the location as well.  And you can see that they were interacting with one another in the photographs I'm going to present to your Honor.  This is going to be Exhibit 4 and Exhibit 5.  On those exhibits, your Honor, is Mr. Dunn and Mr. Macedo, and right next to them are the Chrysler Pacifica.

THE COURT:  Ms. Durrett, any objections?

MS. DURRETT:  No objection for the purposes of this hearing, your Honor.

THE COURT:  4 and 5 are admitted.

MS. OJEDA:  And, your Honor, these were photographs taken from the pole camera that was up at that warehouse.

Your Honor, during -- on this July 5th whenever -- as I mentioned, Mr. Dunn was there.  Mr. Macedo came there.  Also, the courier, the same courier delivered the drugs, those 22 kilograms of cocaine on June 25th, that same courier or supplier was observed driving to the warehouse.  And Mr. Macedo opened the passenger side door, took something out, took it to the minivan, shook hands with the courier.  The courier left, and then I think it was two days later Co-defendant Tyshaun Mobley, the same one from the September 2022 event, she was traffic stopped in the white minivan.  And hidden in those traps were 6 kilograms of cocaine.

Now to be clear, your Honor, these are just a sampling of the calls.  They are not all of the calls that we intercepted discussing narcotics, the sale of narcotics, prices.  Those are enumerable.  And indeed Mr. Dunn used multiple phones, and we were able to wiretap some of them but not all of them, your Honor.  But there were seemingly other deals going on.  That's why we know he was also using other phones to coordinate deals or other applications that we couldn't get because we would observe similar patterns of behavior occurring, but we hadn't intercepted them on our lines.

Nearly every day that we were up on the wire Mr. Dunn

was facilitating another drug transaction, finding customers, persuading couriers, negotiating prices, and it is often that he did not get deterred at all by law enforcement activity. He was seemingly emboldened to actually get more and more drugs and just find more couriers.  Every time he lost something he was -- as he says on his social media, he restored and he replenished and he rejuvenated his supply, and he would find something else to do.

The other part of this, your Honor, is not just the drugs.  It's the money.  And here that is the most important part for drug traffickers.  Now, the defendant does have ties, and I know there's mention that he has businesses, that he is a motivational speaker.  He has this book.  And, indeed, the investigation did show that Mr. Dunn has interests in multiple businesses.  He actually has claimed to make $12,000 monthly as a motivational speaker.  And those are some of the documents that he submitted to purchase some of the things that he uses to maintain his lavish lifestyle, your Honor.

He maintains an 11,400 square foot mansion that he calls the big house, and I'm presenting pictures, Exhibit 6 and 7, to the Court, the residence.

THE COURT:  You said 12,000 a month as a motivational speaker.  At least he told Probation that he hasn't done that since 2023, and he was only making $40,000 annually.

MS. OJEDA:  And the $12,000, your Honor, is, I

believe, based on certain statements.  I don't know if it was on mortgage statements or lease statements that we have found during the course of the investigation.  And so there is a discrepancy there, and we don't know why that is other than different representations at different times.

THE COURT:  Ms. Durrett, any objection to 6 and 7?

MS. DURRETT:  Not for the purposes of this hearing, your Honor.

THE COURT:  They're admitted.

MS. OJEDA:  Thank you.  I'm also going to present -- he also purchased -- your Honor, there's a new model -- well, he purchased last year --

THE COURT:  Just back for one second.

MS. OJEDA:  Sure.

THE COURT:  Tell me again what Government 6 and 7 are.

MS. OJEDA:  The photograph -- 6 and 7 are the photographs of his residence, your Honor, Shady Brook Road, one of his residences.

THE COURT:  This is the Shady Brook Walk in Fayetteville?

MS. OJEDA:  Yes, your Honor.  I'm also presenting Exhibit No. 8, which is a photograph of the Lamborghini that he purchased last year, your Honor.  It's valued at $250,000.  And these are photographs -- the Lamborghini, that photograph

was taken last week during the search of his residence, your Honor.

THE COURT:  Ms. Durrett, any objection to 8?

MS. DURRETT:  Not for the purpose of this hearing, your Honor.

THE COURT:  All right.  It's admitted.

MS. OJEDA:  Your Honor, he also purchased last year, I believe on the same day as the Lamborghini, a 2021 Cadillac Escalade that was valued at 125,000.  He pays, allegedly pays, $8,000 a month for that warehouse at Milam Road.  He pays -- for some time he was paying $5,000 a month for Mr. Macedo's security detail.  He also has mixed payments to cover certain rental payments and down payments for Co-defendant Brittney Hicks and her condo, and he also maintains a condominium in Buckhead and another residence as well.

What the investigation has revealed and based on a review of the intercepted communications, is that from February to July 2023 we don't have evidence that Dunn was actually participating in any way in any kind of verifiable speaking engagement other than his posts on Instagram.

His transportation business, the one that's allegedly at Milam Road called Silk Logistics, based on a review of databases and financial records, there's no income generated by Silk Logistics from February through July.  Agents haven't seen any legitimate transportation business occur at that

warehouse and it's actually not -- it is registered with the Department of Transportation, but it does not have an active license.  So it should not be operating legally at this time.

THE COURT:  What about this Silk's Deluxe Car Wash?

MS. OJEDA:  What I do know about the Silk's Deluxe Car Wash, your Honor, it is a car wash that there's a lease agreement that was seized at his residence last week that stated that he had paid for six months, about 10,000 or maybe a little bit more dollars, six month's lease of that property, all in cash.  And though that's completely legal and it's completely allowed, your Honor, we do think that's another -- working as an undercover, at least one of the co-defendants actually worked at the car wash, one of the co-defendants that has served as a courier for Mr. Macedo.

And I do not believe we have information from the Department of Revenue from that car wash, but all the other businesses that he's associated with, including -- and he has not paid taxes since 2018 for any of those businesses or from his individual pocket as well, your Honor.

THE COURT:  He hasn't paid taxes either business wise or personally --

MS. OJEDA:  Correct.

THE COURT:  -- since 2018?

MS. OJEDA:  Correct.  And, again, I don't believe that includes the car wash but all the other businesses, Silk

Logistics, even some that he has interest in, like Tiffany Boutique.  Again no taxes.

THE COURT:  No taxes, and you said he paid 120,000 for the Lamborghini?

MS. OJEDA:  I believe it was -- the Lamborghini was valued at 250-, your Honor.  I do believe there's still payments that are being made on that, and the Cadillac Escalade was valued at 125-.

THE COURT:  Oh, the Escalade was 125-.

MS. OJEDA:  Uh-huh.  Your Honor, we do think it's significant during the search just by not having these tax records, not having legitimate operating businesses that we've been able to find, in the primary bedroom -- I'm going to show Government Exhibit 9 -- the primary bedroom of the residence there was a notepad, and I cannot confirm whose handwriting it is.  But there was a notepad that said dated June 27th, 2023, I have $10 million.  Your Honor, we don't know where that money is from other than illegitimate sources because, again, there was no record of it.

THE COURT:  Ms. Durrett, any objection to 9?

MS. DURRETT:  I'm going to object to that one, your Honor.  I mean, there's no basis to know whose that is, where that came from.  Obviously, I'm just getting into the case so I don't have all of the discovery, but it seems like just a random note that someone wrote.

THE COURT:  You said this was recovered from --

MS. OJEDA:  From the primary bedroom at Shady Brook.

THE COURT:  I'll admit it.  It goes to weight.  9 is admitted.

MS. OJEDA:  One other point that I do want to make, your Honor, is that when it comes to -- Mr. Dunn does have a book that he has, and that was stated in the, I believe, the opposition motion.  But he has been intercepted and recently on the intercepts talking about how to pay for drug transactions and provide him money orders so that he can write on there book sales.

THE COURT:  Who is this conversation with?

MS. OJEDA:  It was Mr. Dunn and one of the conspirators talking about payment, and he said go to -- I think it was UPS.  You can get a money order there, and I can put book sales.  Your Honor, again this is a way that he uses his businesses as a front to cover for what he's actually doing, was actually funding his lifestyle, which is drug trafficking.

The investigation intercepts also show that Mr. Dunn does keep a significant amount of cash at his residence, and from that cash that's where people are being paid.  That's where Mr. Macedo would come and to receive the cash, and that's where he would pay his couriers from as well.  The intercepts show that Mr. Dunn repeatedly needed to push drugs

so that he could maintain his lifestyle and pay his bills that he had.

What's more, your Honor, his residence is intimately involved with the drug business.  I mentioned earlier with some of the intercepts where couriers were going to the house getting drugs from the vehicle, getting paid from there.  But even last week whenever agents went and searched the residence, they found what hasn't been counted yet, but we do believe approximately $100,000 in cash there at the residence.  I'm presenting Government Exhibit 11 and 12 -- excuse me -- 10 and 11.  These are pictures of the cash that was seized from his residence.

Further, your Honor --

THE COURT:  Ms. Durrett, any objection to 10 and 11?

MS. DURRETT:  Not for the purpose of this hearing, your Honor.

THE COURT:  They're admitted.

MS. OJEDA:  Agents also found money counters, your Honor, and I'm showing -- I'm providing Government Exhibits 12 and 13.  12 is a gold plated money counter, and 13 is another money counter that was also found in the residence, your Honor.

More concerning, your Honor --

THE COURT:  Hang on one second.

MS. OJEDA:  Sure.

THE COURT:  Ms. Durrett, any objection to 12 and 13?

MS. DURRETT:  Not for the purpose of this hearing, your Honor.

THE COURT:  All right.  They're admitted.

MS. OJEDA:  And then, your Honor, agents also found --

THE COURT:  From the search that the government did at the house, did it appear that there are other people living there?

MS. OJEDA:  Yes, your Honor.  I believe his wife lived there as well as one other -- I'm going to consult with my agent if you don't mind, your Honor.

(Brief Pause.)

MS. OJEDA:  And one other individual, William Spencer, your Honor.

THE COURT:  William Spencer.

MS. OJEDA:  Uh-huh.  And, your Honor, something else that -- there were some -- and I do apologize to Ms. Durrett.  I didn't know this when we talked on Friday.  There were narcotics also found at the residence, and I'm showing Government Exhibit 14.  And, your Honor, this shows some pills we had suspected to be Fentanyl or Oxycodone pills.  They were found in the pantry.  There were also five -- I'm sorry.

THE COURT:  Ms. Durrett, any objection to 14?

MS. DURRETT:  Not for the purpose of this hearing,

your Honor.

THE COURT:  That's admitted.

MS. OJEDA:  There were also 5 pounds of marijuana, half a kilogram of cocaine, THC gummies, and I believe --

THE COURT:  How much marijuana?

MS. OJEDA:  5 pounds, 5 pounds of marijuana, half a kilogram of cocaine, THC gummies, and I believe there were about 14 cell phones and other electronic devices.

THE COURT:  Was there anything from the wire to indicate that Mr. Dunn was dealing in Oxycodone?

MS. OJEDA:  Nothing.  Your Honor, I think it would -- hold on, if you don't mind.

(Brief Pause.)

MS. OJEDA:  The only thing I can offer, your Honor, is that, and Mr. Dunn is currently on bond out of Fulton County for charges relating to drug trafficking and possession of a firearm by a convicted felon.  And that did include fentanyl and heroin and, I believe, methamphetamine.

THE COURT:  You may be getting to the -- are you going to get to the bond later?

MS. OJEDA:  Yes.  So, your Honor, I've talked about at length the first charge, and I do want to talk about the nature and circumstances of the second one as well.  And that's the Hobbs Act robbery.  During this investigation the defendant with Macedo-Rios and others that are indicted in

this case planned -- and Mr. Dunn recruited, specifically recruited, individuals to help with the robbery of a rival drug trafficker that was known to have -- believed to have drugs in his house.

The defendant actually directed Brittney Hicks, who's indicted in this case, to purchase a vehicle tracker, and that tracker was actually placed on the intended victim's vehicle. And it was Mr. Dunn and Mr. Small John who placed that tracker, and we know that because Mr. Dunn is on an ankle monitor because of his prior case. And we're able to put him at that location where the residence was in Lilburn, Georgia.

THE COURT: This is the residence of the rival drug trafficker?

MS. OJEDA: Correct.

THE COURT: And how do you know that they put a tracker on that person's car?

MS. OJEDA: Because, your Honor, they're on the intercepts. So actually on the intercepts they did talk about it, Mr. Dunn actually coordinating a meeting of Ms. Hicks, Mr. Hall, Mr. Small, and I believe Mr. Allen. And they coordinated a meeting so that Ms. Hicks could walk them through how to use the app to track the victim, the intended victim.

Your Honor, not only that but there were -- they discussed robbing this victim, but they actually discussed

using violence and using guns to do so.  And I have one more audio recording that I'd like to play, and that is Exhibit 2. And this is going to be an excerpt of Mr. Dunn speaking to Mr. Hall and Mr. Macedo.

THE COURT:  Before you play it, Ms. Durrett, any objection to --

MS. DURRETT:  No, your Honor.  I think I've heard this one.

THE COURT:  Government's Exhibit 2 is admitted.

MS. OJEDA:  And for a date, your Honor, this is March 4th.

THE COURT:  And who is this?  Who is speaking?

MS. OJEDA:  Mr. Dunn.

(Whereupon, an audio recording was played.)

MS. OJEDA:  And, your Honor, they did do their homework.  They did a lot of surveillance, and on the intercepts you hear about the surveillance and identifying who the victim was, what house it was, and trying to determine whether or not the drugs were hidden in the residence or if they're hidden in a storage facility.  Thankfully law enforcement did interfere and encountered the intended victim.

They found the tracker on his vehicle, and law enforcement, our agents, went to that residence and found 65 packages of cocaine in that house.

Your Honor, another point I do want to make -- and I

know I mentioned that already earlier -- is that in May 2021 the defendant was charged in Fulton County with various drug trafficking offenses and, importantly, a felon in possession charge, your Honor.  At the time of his arrest in May 2021 his residence was also searched by law enforcement.  They did find heroin, methamphetamine, and cocaine and fentanyl as well as firearms.

Your Honor, I want to present the picture from the collection of all those items.

THE COURT:  This is from the 2021 --

MS. OJEDA:  From the 2021 case.

THE COURT:  -- arrest that led to the Fulton County charges?

MS. OJEDA:  Correct, your Honor, and this is Government Exhibit 15.

THE COURT:  Ms. Durrett, any objection to 15?

MS. DURRETT:  Not for the purpose of this hearing, your Honor.

THE COURT:  It's admitted.

MS. OJEDA:  And, your Honor, the firearm is in the lower right-hand corner.  It's actually in that money counter printer, the pistol.  It's a 9 millimeter or looks like a 9 millimeter.

THE COURT:  What are all these, like, colored packages in the foreground?

MS. OJEDA:  I believe it's THC gummies or some kind of THC product.

THE COURT:  And this is a collection of items recovered from his house in 2021?

MS. OJEDA:  Yes, your Honor.  I believe it was either his house or an apartment that he was in.  It was an apartment that he was residing in at that time.

And, your Honor, I'm going to -- and I can go ahead and mention it here.  He was released on bond.  He does have an ankle monitor that, as you can see, has not stopped him from continuing to coordinate the trafficking of, significant trafficking, of cocaine.

THE COURT:  So at the time of his -- at the time covered by the indictment he was on an ankle monitor on the bond out of Fulton County?

MS. OJEDA:  Yes.

THE COURT:  Was he still wearing that at the time he was arrested?

MS. OJEDA:  Last week?

THE COURT:  Yeah.

MS. OJEDA:  I believe he was, yes.

Your Honor, given everything I've stated, I do believe based on the surveillance, the intercepts and the seizures, we do believe the weight of the evidence is significant against Mr. Dunn.  And we do want to turn at this

time to his history and characteristics as one of the factors to consider.

Mr. Dunn is a felon who was convicted, I believe, in 1992 of multiple drug trafficking charges, including a continuing criminal enterprise, and he served over -- I believe it was over 20 years in federal prison for the same type of case, your Honor.  Here again is the trafficking of cocaine.

THE COURT:  When did he get released on that federal sentence?

MS. OJEDA:  That I'm not sure of, your Honor.  I believe it would have been 2015?  About 2015, your Honor.

THE COURT:  So his supervised release was over by the time that charged conduct is alleged --

MS. OJEDA:  Yes.  I believe he had 16 months of supervised release -- I'm sorry not 16 month -- yeah, that's right, 16 months of supervised release.

THE COURT:  And you think he got released around 2015?

MS. OJEDA:  Yes, your Honor.

THE COURT:  So at least in theory he wasn't on supervised release until about 2020?

MS. OJEDA:  Right.  And then as I've already mentioned, your Honor, if he's done with supervised release, you know, it would have -- let's even say 2019.  By 2021 he's

28

arrested again for drug trafficking, and then in this case starting end of 2022 at least we have him facilitating drug trafficking again.

THE COURT:  So that Fulton County case is pending; correct?

MS. OJEDA:  Yes, your Honor.  To the government his repeated violations of the law, his repeated disregard for the law despite being on an ankle monitor, being able to facilitate this vast amount of drug trafficking even from his home displays that he is a continued danger to the community and that no conditions can actually prevent him from continuing to be a danger should he be released.  He's recruiting -- I'm sorry.

THE COURT:  Do you know anything about his assault conviction that looks like it occurred from within the facility, the detention facility in 1994?

MS. OJEDA:  It does, your Honor.  It does look like -- I do believe that he, I think, has -- he was convicted in '92, and I think that assault happened in 1993 so pretty quickly after at least being convicted in that case.  I do believe it was internal, I believe, to a guard.

THE COURT:  Okay.

MS. OJEDA:  When it comes to a violent history, that would be the violent history from 1993.  Until then we have the firearm in 2021, him discussing a robbery recently, this

year, using pistols.

What is also disturbing here, your Honor, is that Mr. Dunn recruits a seemingly endless number of individuals to participate with him in trafficking of narcotics, of serving his couriers and offering them payments of $300 here, $400 here to make these trips.  And what's concerning to me, I know there were letters of support that were submitted, but it is concerning to me that Mr. Dunn is mentoring young youth.  And I believe that is a susceptible community that's going to see his lavish lifestyle, that's going to want to follow in his footsteps, and it's not doing legitimate business.  It's further involvement in drug trafficking.

He has not turned his life around, as stated in a motion that was filed.  He has not changed his perspective. He is still doing the same thing that he's been doing, which is this drug trafficking.

As stated before, I don't believe that Mr. Dunn has any actual legitimate income at least consisting -- that he's hiding quite a bit behind.  Some of these businesses, many of which aren't even in his name, even the Milam Avenue warehouse that he was paying rent wasn't even in his name.  And it's another indicator, your Honor, that we've seen over and over again of trying to, you know, hide assets and be able to move money easier.

As I mentioned, some of the suggestions in the motion

filed by opposing counsel were GPS monitoring, home detention, location restrictions.  That's already been done, your Honor, and it hasn't been effective.  Being at home with access to a phone is what he's been doing for months, and that's what he needs.  And that's what he's successful at given his broad reach and distribution network.  Being on bond didn't stop him from coordinating these massive amounts of crime including planning a violent crime.

We also do believe there is a flight risk here, your Honor.  I understand that Mr. Dunn does have significant ties to the community, but he also has significant ties out of state, as intercepted on these phone calls to various drug traffickers in other states and even outside the boarders of the United States.  He's facing a significant sentence, your Honor, even just with the charges that we have in this case, and a significant sentence can be motivation for a person to fly and avoid the consequences of a crime.

In summary, we do believe that the defendant is a sophisticated and prolific drug trafficker operating in Georgia.  That is how he funds his lifestyle.  He's demonstrated his ability to evade law enforcement detection.  Even on the wire there were phone calls made of -- by his family members of, oh, we think somebody is watching the house, things of that nature.  And despite knowing about enforcement measures, stops are made of his own couriers.  He

continued selling cocaine. He continued distributing cocaine at a high volume.

He does not have any respect for the laws of the United States and should not be released because otherwise that would pose a very real danger to the community. And as a result, we do not believe there's any conditions or combination of conditions that would allow him to not be a danger to the community, and we do believe he's a flight risk. Thank you.

THE COURT: Ms. Durrett, I'm just going to take a very brief recess before you get started.

MS. DURRETT: Thank you, your Honor.

COURTROOM DEPUTY: All rise.

(Brief recess.)

COURTROOM DEPUTY: All rise. Court is again in session.

THE COURT: All right. We are back on the record in the case of United States of America v. Charles Dunn. It's 23-CR-229. Ms. Durrett, happy to hear from you.

MS. DURRETT: Thank you, your Honor. I know the Court has heard from me on bond issues before, and I always say, you know, we hear a lot of evidence. I haven't had a chance to look at any of the discovery or see what any of it is and, you know, so I understand --

THE COURT: The weight of the evidence is always the

least significant of the --

MS. DURRETT:  Right.  And that's my point, and so I think that if we look at Mr. Dunn's life, I think there is a potential here for there to be conditions that could ensure that he appears in court and could ensure that the safety of the community is ensured.  I know the Court has -- I assume the Court has looked at the documents that I filed.

THE COURT:  I have.  I've got all the letters.

MS. DURRETT:  Right.  So he submitted quite few letters.  He also has a number of people here supporting him.  If you're here for Mr. Dunn, just stand up so the Court can see the number of people who have come down.  So he has --

THE COURT:  I appreciate y'all being here today.  Thank you.

MS. DURRETT:  Thank you, your Honor.  He has family members.  He has -- Andre Dupree is here.  I think he submitted a letter to the Court.  He is someone that has assisted Mr. Dunn in his speaking engagements in the past so has secured, you know, his appearance at community groups or schools or other places so that he could talk about his journey having previously been incarcerated and then written a book about how to find, I think, what he calls the light in the darkness and to move forward.

So I did some googling of my own, and I could see that he appeared on morning shows and has, you know, some

33

social media content.  I think that there's another letter here from Larry Miller who is also present in court today, and Larry is one of the people who helps with Power Moves LLC, which helps with the online social media content.  And this is in my Document 76-3, page 2.  And so he -- I know the government has suggested that everything he does is a front for other types of activity, illegal activity, but I think that there is legitimate proof here from third parties that he is out actually doing things in the community and doing things that are not illegal.

So I understand the Court has to consider what the government has presented, but I think that given his community support -- his wife is also here I will note, Tisha.

THE COURT:  Good morning.

MS. DURRETT:  His wife is here.  I know that the -- I think the probation report said that they were separated, but she does intend to live with him if he is released from custody and has told me she would even be willing to be a third party custodian if the Court needed that.  So he has a marriage that -- he's been married to her for 31 years. They've lived in Atlanta at least since 2015, so I don't think that there's a danger that he is going to be running away from that.  So I think the Court if -- I don't think he's a flight risk, but if the Court were concerned about that, I think it could be mitigated through conditions that the Court could

set.

I did want to talk about a few things that the government mentioned.  I think the case in Fulton County, again, it goes to part of what the government is presenting against him, but it's my understanding that that case is still in the complaint room there.  There hasn't been an indictment in that case.  He is on bond in that case, so, you know, I don't know how that case will move forward or if it will move forward.

My understanding as far as the assault that the Court asked about, was that that was an impeding an officer charge, and I don't know the facts of it.  I was unable to pull some of the stuff up on Pacer, I think, due to the date of things, but that's my understanding, that it wasn't actually a violent assault.  But that's my understanding of it, your Honor.

So what he has is the first three arrests or issues listed on page 3 of the bond report, I think those are all tied in together to the same event, and then he has that impeding an officer or forcible assault as it's listed.  And then he has the Alpharetta complaint, and then the current case, your Honor.  I know that is a lot of criminal history, but I do think that one important factor is that there were no guns found in the residence.  And I know the government played an audio of a discussion of a robbery, but I think that if -- I hope that if I hear the rest of it, there's a discussion of

not using guns.  And I think that that's my understanding of what I will hear if I hear the rest of the recording.

So I understand they're concerned that he was in this discussion about a robbery, but as the Court knows and as I know, sometimes those are initiated by other people in the conspiracy and for various reasons they're initiated.  And so until I have a chance to understand the evidence in the case, and so I'm sorry that I won't be able to make more comments about that.  But I do want the Court to understand that he has a supporting wife, he has a supporting community, and he has people who will help him if he is admitted to bond in this case.

As far as the money goes, your Honor, I did not hear the government talk about his bank accounts at all, and I assume that they've been able to locate his bank accounts and find out what's in there.  So I have no reason to dispute what he has reported here in the pretrial report, which was roughly $3,000 in the bank account with some debt as well.  So I don't have a reason to dispute that, and I haven't heard anything from the government that would make me dispute what's in his bank accounts at least.

His wife does work full-time.  She's worked for AT&T for the last 15 or 16 years, so she has no convictions, felony or misdemeanor and any other.  And so that would be a suitable person who could serve as a third party custodian if the Court

wanted.

As far as money goes and how they were paying their rent, I do know that they were in a car accident several years ago, and they did receive a settlement from State Farm.  So they received a hundred thousand dollar settlement.  It's my understanding that most of that money is now gone, but they did have that settlement.  And they were able to pay bills using that money.

So, your Honor, I know we always hear a lot of evidence, and we wouldn't be here if there wasn't some allegation of a crime.  But I think that the idea that there are no conditions that can be crafted to ensure that he returns to court or the safety of the community is -- it is such a high burden, I think, to show that you can't do anything at all to ensure that he returns to court.  I just think it's hard for me to fathom, you know, a situation like that, so I think the Court could craft conditions and that Mr. Dunn should be released on bond.

THE COURT:  Thank you.

MS. DURRETT:  Thank you.

THE COURT:  Ms. Ojeda, does that raise anything that you'd like to respond to?

MS. OJEDA:  Your Honor, primarily we would be concerned if Ms. Evans Dunn is serving as a third party custodian.  She was intercepted talking to her husband

about -- well, Mr. Dunn told his wife about the 20-kilo seizure from Mr. Allen. She was intercepted providing -- she was instructed to provide $36,000 in bulk currency to Mr. Macedo when he came to the house. Also, her job at AT&T is one of the ways that they've been able to get phones that have been used in this conspiracy and not only for Mr. Dunn but also for the couriers. So we would be concerned for her to serve as a third party custodian.

THE COURT: Thank you. All right. I'm going to take about the next 10 or 15 minutes or so to kind of think about what I've heard and gather my thoughts, and I'm going to leave you all just kind of sitting here. So we'll just take a short break.

MS. DURRETT: Thank you, your Honor, and I if could just say one other thing?

THE COURT: Of course.

MS. DURRETT: If the Court is thinking about the third party custodian, we do have a room full of individuals here who are supporting him. So if that's something on the Court's mind, certainly I can talk with them during the break.

THE COURT: Okay. Thank you.

MS. DURRETT: Thank you.

(Brief recess.)

COURTROOM DEPUTY: All rise. Court is again in session.

THE COURT: All right. Mr. Dunn, there are a number of factors that federal law requires me to consider when making the determination about whether to detain you pending trial or to release you on a bond. They include the nature and circumstances of the offense charged, including whether it is one that is a crime of violence or involves a controlled substance, the weight of evidence against you, the history and characteristics of you, including your character, your physical and mental condition, your family ties, your employment, your financial resources, your length of time in the community, your community ties, your past conduct, your history relating to drug or alcohol abuse, criminal history, and your record concerning appearance at court proceedings, including whether at the time of the current offense you were on probation, parole or any other sort of release pending trial, and, finally, the nature and seriousness of the danger to any person of the community that would be posed by your release.

In this case there is a presumption of detention. It's one that you can rebut or have the opportunity to rebut, but that is a starting point and those are the factors that I am required to consider.

When I look at the nature and the circumstances of the offense charged, obviously we're dealing with very serious charges, conspiracy to engage in the drug trafficking and the

Hobbs Act robbery and to kind of look at these together with the weight of the evidence.  I mean, the weight of the evidence, as I mentioned before, is the factor that I give the least weight to or the least consideration to.  You have an exceptionally good lawyer, but she hasn't had the evidence yet.  She probably doesn't have most of it yet and certainly has not had time to wade through it.

That being said, I am required to consider it, and what the government has presented is, you know, a scenario involving massive quantities of cocaine.  My rough calculation was over a hundred kilos just of what they proffered here today.

The calls that they played are exceedingly concerning to me.  They demonstrate an attitude of just not being worried and not particularly caring after you knew that the government was at least investigating.  I mean, you know, after the traffic stops where people got pulled over and things had been seized, it was just a very cavalier attitude.  The phone call where you're talking about the robbery and whether or not to use guns during that robbery was chilling.  I mean, it's just -- there's really no other way to describe it.

So, obviously, I have significant concerns given the quantities of cocaine that we're dealing with, the allegations that you were planning a robbery of a rival drug dealer, and from what I heard and saw from the exhibits that the

government submitted today.

When I look at the history and characteristics of you, you received an exceedingly long federal drug sentence, over 20 years, and best I can tell is that it didn't appear to deter you in the least. Within a year or so of finishing the supervised release, best I can tell if I'm doing the math right, within a year or so of finishing supervised release you're charged in Fulton County, and then within another two years you're charged in the current case.

The Fulton County case involves an allegation that you were in possession of a firearm, and the allegations are that you committed all of this conduct while you were on the bond out of Fulton County, while you were on an ankle monitor. You were on an ankle monitor when you got arrested in this case. And, quite frankly, I use that as the best example of how I think you would behave if I were to put you on a bond. That Fulton County bond didn't appear to give you one moment of concern.

I have grave concerns about your access to cash and assets. It appears that there were a large amount of cash recovered in your house at the time of the arrest. The government estimated it at over a hundred thousand dollars. I know that hasn't been finalized yet, but obviously there was enough to require you to have two money counters to process the amount of cash that you're apparently dealing with.

41

There were drugs at the house.  I was exceedingly concerned about the call where you were combining your two endeavors, combining the drug business and your other business with the whole deal about using money orders so that that money could appear to be from legitimate sources.

It appears that you're spending massive quantities of cash on recent vehicle purchases.  There's a very large home.  It all suggests to me that you have assets or that you have access to significant amounts of cash that are not reflected on the pretrial services report.

I credit that you have very strong ties to the community.  I appreciate the letters of support that you've submitted.  I appreciate the number of people you have here today, but I have to look at that through the lens of the fact that all of this is alleged to have occurred while you had all those community ties.  And typically when I think about somebody with the ties to the community that you have and the work that you're doing, you know, the thought is that that will generally mean that somebody is not going to be engaging in this kind of activity, and those things appear to me to be very contradictory.

So at the end of the day I don't find that you have rebutted the presumption.  I have grave concerns about you being a flight risk if I were to put you on a bond given the exceedingly long sentence that you're looking at if you're

convicted in this case, given your prior drug conviction, given your apparent actions while you were on a bond out of Fulton County with an electronic monitoring.

Sometimes I have trouble gauging what being on release in state court means.  Sometimes it's not very active.  Sometimes somebody is not actually being supervised.  Here you were on fairly restrictive conditions of release out of Fulton County.  You were on an ankle monitor, and that doesn't appear to have caused you the least bit of concerns.

I have grave, grave concerns about you being a danger to the community that seems to be just unrelenting drug trafficking activity with great efforts to harm and interact with those that are rivals of you.  The idea of putting a tracker on a rival's car and talking about robbing them and using guns, I can't even fathom conditions of release that I could impose that would satisfy my concerns on either half of the analysis, both the danger to the community and the risk of flight.

So I'm going grant the government's motion for detention.  I am going to order that you be held in custody pending a trial in the case.  Ms. Durrett, the evidence that I heard today gave me real doubt about my prior order appointing counsel in this case, so I do intend to reconsider that order.  I'm not going to do it today.  I want you -- I want to give you time to gather evidence and to be able to be ready for

that hearing, but I do intend to reconsider and relook at my order appointing counsel in this case.  There appears to be just massive assets that were not reflected in the pretrial services order.

MS. DURRETT:  Thank you, your Honor.

THE COURT:  I'll let you get with Mr. Jarvis, and we'll get that back on the calendar.  But I am going to schedule a hearing to reconsider that order.

MS. DURRETT:  Thank you, your Honor.

THE COURT:  All right.  Ms. Ojeda, is there anything else we can take up on behalf of the United States?

MS. OJEDA:  No, your Honor.

THE COURT:  Ms. Durrett, anything else on behalf of Mr. Dunn?

MS. DURRETT:  No, your Honor.

THE COURT:  All right.  Very well.  We're in recess. Mr. Dunn, good luck to you, sir.

(Whereupon, the proceedings were adjourned at 11:25 a.m.)

- - -

44

REPORTERS CERTIFICATE

I, Wynette C. Blathers, Official Court Reporter for the United States District Court for the Northern District of Georgia, with offices at Atlanta, do hereby certify:  That I transcribed the proceedings from an electronic recording on the Stenograph machine from the proceedings held in open court on July 17, 2023, in the matter of UNITED STATES OF AMERICA v. CHARLES DUNN, Case No. 1:23-CR-00229-JPB-RDC-1; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (Pages 1 through 43) is a true and accurate record of the proceedings.

This the 19th day of January, 2024.

_____
/s/ Wynette C. Blathers, RMR, CRR
    Official Court Reporter