UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　Plaintiff,<br><br>v.<br><br>CHARLES DUNN,<br>　　　　Defendant, | )<br>)<br>)<br>) Case No. 1:23-CR-229-JPB-RDC<br>)<br>)<br>)<br>) |

**REPLY IN SUPPORT OF POST HEARING BRIEF**

Statements made during a custodial interrogation are inadmissible unless the Government establishes that the defendant "in fact knowingly and voluntarily waived [his] Miranda rights when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). It has not done so here.  The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda* and were otherwise voluntary, *Missouri v. Seibert,* 542 U.S. 600, 608 n. 1 (2004).  It has not met its burden here.

Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Moran v. Burbine,* 475 U.S. 412, 421 (1986) (outlining the two-part inquiry into whether a defendant's waiver of *Miranda* rights was voluntary, knowing, and intelligent.). Mr. Dunn's alleged waiver was not the result of a free and deliberate choice

because it was the result of trickery and deception of the officers. By design, he was read his rights at the most vulnerable and confusing time possible by an officer who had no intention of questioning him about the case.  Further, a waiver was not made with the full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it because he was told that he was only going to be questioned about personal information for paperwork.  How could Mr. Dunn know that, later in the day, he would be questioned in a dramatically different type of interview that would have very serious consequences for his case when he was not notified about any of that at the time of the *Miranda* reading? He could not. How could the *Miranda* warning provided by Officer Noe provide the necessary awareness to render the waiver valid for the later interrogation?  It could not.

## I.    Mr. Dunn's alleged *Miranda* waiver was not the result of his free and deliberate choice.

The relinquishment of the right against self-incrimination must be voluntary in the sense that it is the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Moran,* 475 U.S. at 421. Mr. Dunn has explained that the stress of the morning and the chest pains he was suffering prevented him from making a knowing, voluntary, and intelligent waiver. Approximately 50 armed officers breached Mr. Dunn's front door at 6:00 am, threw a flash-bang device, and arrested all occupants of his house. The whole

purpose of the flashbang device was to "disorient and disrupt" Mr. Dunn's senses so that he would comply. *See* Doc. 672 at 32. There was no intervening event or break in the traumatic events of the morning before he was taken to see Officer Noe and read his rights. Under the circumstances, his waiver could not have been knowing, voluntary, and intelligent and any statements that Mr. Dunn made were not voluntary but were the result of the officer's trickery.

The government relies on *United States v. Barbour*, 70 F.3d 580 (11th Cir. 1995), which held that the fact that a defendant was suffering severe depression does not render his statements involuntary *unless the agents took advantage of his mental illness*. 70 F.3d at 585 (emphasis added). Here, agents took advantage of Mr. Dunn at his most confused state – soon after the use of a flash bang device and the heavily armed entry into his home and immediately after he was told he should seek treatment for his chest pains. The government repeatedly states that Mr. Dunn was "medically cleared" before he was questioned, but Officer Dyar testified that Mr. Dunn was advised that he should be transported by an ambulance due to his chest pains. Doc. 672 at 36. No medical personnel testified or provided any information that Mr. Dunn was "medically cleared," and nothing in the "refusal of care form" provided by the government shows otherwise.

The government also relies on *United States v. Rush*, 144 F. App'x 13 (11th Cir. 2005). In that case, the defendant was taken to the hospital, received treatment

from a doctor for approximately two hours, and was then medically cleared by hospital staff. Agents spoke with the doctor and made sure that Rush was not under any kind of narcotic or pain medication. They also specifically asked the doctor whether Rush was given any kind of medication that might affect his ability to think or reason and whether Rush was suffering from a heart attack or some other similar condition, to which the doctor responded that Rush was not. 144 F. App'x at *15. Rush then signed as waiver of rights form and was questioned about the offense for which he was being arrested.

The facts in *Rush* do not support a finding that the statements here were voluntary or that a *Miranda* waiver was freely, voluntarily, and knowingly given. Here, there is no evidence of "medical clearance." Although Officer Dyar thought that Mr. Dunn had received an EKG, he had no paperwork or proof of such a test, much less any results from such a test. Officer Dyar was questioned about this:

> Q. Okay. And I think when you were testifying earlier, you said something about they did an EKG and there was this result. Where is that information?
>
> A. I don't have that information. I only got the Refusal For Treatment form. I have no knowledge of anything else, other than I know they did put EKGs on him because there was one left on his body and it was found when he was processed by the marshals. That's the only reason I know.
>
> Q. Okay. But you said earlier he was given an EKG and cleared, but you don't have those are results?
>
> A. No.

4

Doc. 672 at 37.  Officer Dyar testified that the refusal form shows that Mr. Dunn was advised to be transported to the hospital for medical treatment.  He allegedly refused that transport and was left at his residence. These circumstances are very different than receiving medical clearance from a doctor, as occurred in *Rush*. This court should find that this case is not like *Rush;* it should find that Mr. Dunn's statements were not voluntarily and any alleged waiver could not be knowing, voluntary, or intelligent under the circumstances.

## II.    Mr. Dunn's alleged *Miranda* waiver was not the result of free and deliberate choice.

Any *Miranda* waiver must be made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran,* 475 U.S. at 421.  Mr. Dunn asserts that he could not understand the nature of the right abandoned and the consequences of the decision to abandon it when the only officer to discuss his rights with him assured him he was not going to ask him any questions.  The government relies upon *Martin v. Wainwright*, 770 F.2d 918 (11th Cir. 1985), to show that officers need not repeat *Miranda* for successive questioning in some circumstances.  Doc. 796 at 14. *Martin* offers little help here. There, the defendant was arrested and interrogated off and on during the same day. He confessed. It is undisputed that he was read and waived his *Miranda* rights prior to the start of the interrogation about his criminal acts. *Id.*

at 924.  He was also questioned a week later. The defendant argued that the later confession was obtained in violation of *Miranda,* in that the police who questioned him on that date did not fully rewarn him of all of his *Miranda* rights. However, a tape recording of the later interrogation showed that, at the beginning of the interrogation, an officer stated: "All right, Lee. I will remind you of your constitutional rights. You know that you don't have to talk to me. You have an attorney who says that he wishes for you to talk to no one but you're going to talk to me of your own free will and because you want to, is that correct?" The defendant answered, "Right." *Id*. at 930.

In *Martin*, the nature of both interviews was the same.  Both interviews were designed to elicit incriminating answers about the case. Additionally, the defendant was fully warned about his rights prior to the first interview and was substantially reminded of those rights before the second interview.  In Mr. Dunn's case, the two interviews were completely different in their nature: one was biographical and not designed to elicit incriminating information and the other was clearly meant to elicit incriminating information. No one re-warned Mr. Dunn, even partially, of his *Miranda* rights. No one told him that he did not have to talk and no one asked if he was speaking based on his own free will. The finding in *Martin* does not apply here.

6

The government also relies upon *Biddy v. Diamond*, 516 F. 2d 118 (5th Cir. 1975), to support the claim that officers need not repeat *Miranda* warnings for second interviews. *Biddy* is inapposite. There, the defendant was read her *Miranda* rights and signed a waiver of rights form. *Id*. at 120. Later that day, prior to taking a polygraph test, she was *again* advised of her rights and she signed a *second* waiver form. She further evidenced her understanding of her rights by asking for "her lawyer" during the administering of the polygraph test. Upon that request, the test was halted and she was questioned no further. *Id*. at 120-21. Twelve days later, both she and her husband were asked to come to the police station. Her husband specifically contacted an attorney to meet them at the station. At the station, while her husband was talking to the attorney, the detectives indicated they might want to question Mrs. Biddy and asked her, "Do you understand your rights?" To this she responded that she understood them. She then made an incriminating statement to her husband in front of the officers.

The facts in *Biddy* do not support the government's argument. Here, agents made a plan the day before they planned to arrest Mr. Dunn. They agreed that agents at Mr. Dunn's home would *Mirandize* him but not interrogate him. Doc. 672 at 88. The interrogation was to be saved for Agent Hernandez at the courthouse. Doc. 672 at 106. So, under the guise of needing to ask Mr. Dunn biographical questions, Officer Noe read Mr. Dunn his *Miranda* rights. The

government concedes that Officer Noe did not ask the final question on his DEA

Form 13 card, "Are you willing to answer some questions?" Doc. 796 at 5. This

was purposeful. At the hearing, Officer Noe acknowledged that the last line on the

card is the actual waiver of rights.  He was questioned by the government:

> Q. After you read a suspect -- a suspect his or her *Miranda* rights, do
> you ask for a waiver of their rights before proceeding with the
> interview?
>
> A. Usually part of the thing is when you answer questions, that's the
> last line on the card. Sometimes we actually get them to sign a
> Miranda form, which is a waiver that they have been read and
> understand their rights. Sometimes I don't have the form. I don't have
> one to get signed.

Doc. 672 at 62. But Officer Noe did not ask that final question this time. He

purposely stopped short. He testified, "I pulled the card out of any wallet and read

to him from the card. And then when I finished, he acknowledged that he

understood. And instead of asking the last line, 'Will you answer questions?' I

advised him, 'I'm not going to ask you any questions. This is not my investigation.

I'm not going to ask you any questions except for personal information for me to

put on the paperwork.'"[1] Doc. 672 at 62.  This assurance that he would not

question Mr. Dunn about the case was meant to place Mr. Dunn at ease so that he

---

[1]    In *Pennsylvania v. Muniz*, 496 U.S. 582, 602 (1990), the Supreme Court recognized a "routine booking question" exception to *Miranda* that covers routine questions concerning a defendant's biographical data necessary to complete booking.  If Officer Noe truly intended to just ask biographical questions, it appears he could have done so without reading the *Miranda* warnings.

felt comfortable answering biographical questions. The Court should not take Mr. Dunn's responses to Officer Noe as a knowing waiver of his rights given the assurances provided by Officer Noe, particularly when he stopped short of getting a full waiver from Mr. Dunn. The only warnings Mr. Dunn had been given were accompanied by assurances that only biographical questions would be asked. The nature of the afternoon interrogation warranted a new *Miranda* warning and it could have easily been provided, but because it was not part of the plan developed prior to Mr. Dunn's arrest, Agent Hernandez chose not to provide it.

In response, the government argues that *Miranda* warnings are not invalidated merely because "law enforcement officers change the subject matter about their questioning to other criminal matters." Doc. 796 at 15. Both of the cases cited by the government involve cases where officers questioned defendants about criminal matters in *both* interrogation sessions. Here, officers planned a bait and switch: offering *Miranda* warnings when "no questions about this case" would be asked and questioning Mr. Dunn when no warnings were given. This is exactly the kind of trickery *Miranda* is aimed at preventing. This Court should find that the questioning of Mr. Dunn without a subsequent *Miranda* warning warrants suppression.

9

### III. Mr. Dunn's waiver could not be knowing and voluntary because officer deception went directly to Mr. Dunn's rights and the consequences of waiving them.

The Eleventh Circuit recently explained that police deception renders a suspect's statement involuntary either (1) "where the deception took the form of a coercive threat" or (2) "where the deception goes directly to the nature of the suspect's rights and the consequences of waiving them." *United States v. Morgan*, 143 F.4th 1264 (11th Cir. 2025), *citing Farley*, 607 F.3d at 1328–29. The government argues that Officer Noe did not contradict any *Miranda* warnings with his statements. Doc. 796 at 16. This is not true.

Officer Noe stated "Anything you say can be used against you in Court," but then stated, "I'm not going to ask you any questions. This is not my investigation. I'm not going to ask you any questions except for personal information for me to put on paperwork." Doc. 672 at 62. He made sure Mr. Dunn knew his questions were meant to obtain information only for paperwork, not something to be used in the case against Mr. Dunn. No other warnings were given when the nature of the questioning changed to things that could be used against him in court. This case is similar to the facts of *United States* v. *Lall,* 607 F.3d 1277 (11th Cir. 2010), where an uncounseled 20-year-old confessed after an officer "explicitly assured [him] that anything he said would not be used to prosecute him" and that the defendant "would not be charged for any statements or evidence collected on the night of the

10

robbery." 607 F.3d at 1287. Officer Noe's statements were similar to the statements in *Lall*. They were statements intended to put Mr. Dunn at ease and to assure him that no incriminating evidence would be obtained through his answers. The statements contradicted the warnings that information provided could be used against him in court.

For al of these reasons, this Court should suppress Mr. Dunn's statements.

Respectfully submitted this 5th day of December 2025.

s/Saraliene S. Durrett
Saraliene Smith Durrett, LLC
1800 Peachtree Street, Suite 300
Atlanta, GA 30309
(404) 433-0855
ssd@defendingatl.com
Counsel for Defendant Dunn